## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ENVIRONMENTAL DEFENSE FUND,
ENVIRONMENTAL INTEGRITY
PROJECT, HOOSIER
ENVIRONMENTAL COUNCIL,
NATURAL RESOURCES DEFENSE
COUNCIL, and SIERRA CLUB,

                    *Petitioners*,

    v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY and MICHAEL S. REGAN, in
his official capacity as Administrator of the
United States Environmental Protection
Agency,

                    *Respondents*.

Case No.  24-1354

## PETITION FOR REVIEW

Pursuant section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1),

Rule 15 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rule 15,

Environmental Defense Fund, Environmental Integrity Project, Hoosier

Environmental Council, Natural Resources Defense Council, and Sierra Club

hereby petition for review of United States Environmental Protection Agency's

final action titled "Review of Final Rule Reclassification of Major Sources as Area

Sources Under Section 112 of the Clean Air Act," and published at 89 Fed. Reg.

73,293 (Sept. 10, 2024) (attached).

DATED: November 12, 2024

/s/ Sanjay Narayan
Sanjay Narayan
Sierra Club Environmental Law
Program
2101 Webster St., Ste. 1300
Oakland, CA 94612
(415) 977-5769
sanjay.narayan@sierraclub.org

*Counsel for Sierra Club*

/s/ James Pew
James Pew
Earthjustice
1001 G. St., NW, Ste. 1000
Washington, D.C. 20001
(202) 667-4500
jpew@earthjustice.org

*Counsel for Environmental Integrity
Project and Hoosier Environmental
Council*

Respectfully submitted,

/s/ Vickie L. Patton
Vickie L. Patton
Noha Haggag
Environmental Defense Fund
2060 Broadway, Ste. 300
Boulder, CO 80302
(303) 447-7214
vpatton@edf.org
nhaggag@edf.org

*Counsel for Environmental Defense
Fund*

/s/ John Walke
John Walke
Emily Davis
Natural Resources Defense Council
1152 15th St., NW, Ste. 300
Washington, D.C. 20005
(202) 289-6868
jwalke@nrdc.org edavis@nrdc.org

*Counsel for Natural Resources
Defense Council*

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| ENVIRONMENTAL DEFENSE FUND, ENVIRONMENTAL INTEGRITY PROJECT, HOOSIER ENVIRONMENTAL COUNCIL, NATURAL RESOURCES DEFENSE COUNCIL, and SIERRA CLUB, | Case No. |
| *Petitioners*, | |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, in his official capacity as Administrator of the United States Environmental Protection Agency, | |
| *Respondents*. | |

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioners Environmental Defense Fund, Environmental Integrity Project, Hoosier Environmental Council, Natural Resources Defense Council, and Sierra Club make the following disclosures:

### Environmental Defense Fund

Environmental Defense Fund is a national non-profit organization, organized under the laws of the State of New York, that links science, economics, and law to create innovative, equitable, and cost-effective solutions to urgent environmental

problems.

Environmental Defense Fund does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Environmental Integrity Project

Environmental Integrity Project, a corporation organized and existing under the laws of the District of Columbia, is a national non- profit organization that advocates for more effective enforcement of environmental laws.

Environmental Integrity Project does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Hoosier Environmental Council

HEC is a non-profit corporation organized and existing under the laws of the state of Indiana. HEC is Indiana's largest environmental public policy organization, working to improve our health, economy, and environment for thirty-five years, through education, technical assistance, and advocacy.

HEC does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Resources Defense Council

Natural Resources Defense Council, a corporation organized and existing under the laws of the State of New York, is a national nonprofit organization dedicated to improving the quality of the human environment and protecting the

nation's endangered natural resources.

Natural Resources Defense Council does not have any parent corporations and no publicly held corporation has a ten percent or greater ownership in it.

## Sierra Club

Sierra Club is a non-profit corporation organized under the laws of the State of California. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

Sierra Club does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in Sierra Club.

DATED: November 12, 2024                    Respectfully submitted,

/s/ Sanjay Narayan                          /s/ Vickie L. Patton
Sanjay Narayan                              Vickie L. Patton
Sierra Club Environmental Law               Noha Haggag
Program                                     Environmental Defense Fund
2101 Webster St., Ste. 1300                 2060 Broadway, Ste. 300
Oakland, CA 94612                           Boulder, CO 80302
(415) 977-5769                              (303) 447-7214
sanjay.narayan@sierraclub.org               vpatton@edf.org
                                            nhaggag@edf.org
Counsel for Sierra Club
                                            Counsel for Environmental Defense
                                            Fund

/s/ James Pew
James Pew
Earthjustice
1001 G. St., NW, Ste. 1000
Washington, D.C. 20001
(202) 667-4500
jpew@earthjustice.org

*Counsel for Environmental Integrity Project and Hoosier Environmental Council*

/s/ John Walke
John Walke
Emily Davis
Natural Resources Defense Council
1152 15th St., NW, Ste. 300
Washington, D.C. 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org

*Counsel for Natural Resources Defense Council*

# CERTIFICATE OF SERVICE

I hereby certify that on this 12 day of November, 2024, the foregoing

**Petition for Review** and **Rule 26.1 Disclosure Statement** were served on

Respondents by sending a copy via First Class Mail to each of the following

addresses:

Michael S. Regan, Administrator
EPA Headquarters 1101A
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Merrick B. Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Correspondence Control Unit
Office of General Counsel (2311)
United States Environmental Protection Agency
William Jefferson Clinton Federal Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

*/s/ James Pew*
James Pew

# ATTACHMENT



(b) *Definitions*—(1) *Captain of the Port* means Commander, Coast Guard Sector Delaware Bay.

(2) *Representative* means any Coast Guard commissioned, warrant, or petty officer or civilian employee who has been authorized to act on the behalf of the Captain of the Port.

(3) *Port Condition WHISKEY* means a condition set by the COTP when National Weather Service (NWS) weather advisories indicate sustained gale force winds (39–54 mph/34–47 knots) are predicted to reach the COTP Zone within 72 hours.

(4) *Port Condition X–RAY* means a condition set by the COTP when NWS weather advisories indicate sustained gale force winds (39–54 mph/34–47 knots) are predicted to reach the COTP zone within 48 hours.

(5) *Port Condition YANKEE* means a condition set by the COTP when NWS weather advisories indicate that sustained gale force winds (39–54 mph/34–47 knots) are predicted to reach the COTP zone within 24 hours.

(6) *Port Condition ZULU* means a condition set by the COTP when NWS weather advisories indicate that sustained gale force winds (39–54 mph/34–47 knots) are predicted to reach the COTP zone within 12 hours.

(7) *Port Condition RECOVERY* means a condition set by the COTP when NWS weather advisories indicate that sustained gale force winds (39–54 mph/34–47 knots) are no longer predicted for the regulated area. This port condition remains in effect until the regulated areas are deemed safe and are reopened to normal operations.

(c) *Regulations*—(1) *Port Condition WHISKEY.* All vessels must exercise due diligence in preparation for potential storm impacts. All oceangoing tank barges and their supporting tugs and all self-propelled oceangoing vessels over 500 gross tons (GT) must make plans to depart no later than setting of Port Condition YANKEE unless authorized by the COTP. The COTP may modify the geographic boundaries of the regulated area and actions to be taken under Port Condition WHISKEY, based on the trajectory and forecasted storm conditions.

(2) *Port Condition X–RAY.* All vessels must ensure that potential flying debris and hazardous materials are removed, and that loose cargo and cargo equipment is secured. Vessels at facilities must carefully monitor their moorings and cargo operations. Additional anchor(s) must be made ready to let go, and preparations must be made to have a continuous anchor watch during the storm. Engine(s) must be made immediately available for

maneuvering. Also, vessels must maintain a continuous listening watch on VHF Channel 16. All oceangoing tank barges and their supporting tugs and all self-propelled oceangoing vessels over 500 GT must prepare to depart the port and anchorages within the affected regulated area. These vessels shall depart immediately upon the setting of Port Condition YANKEE. During this condition, slow-moving vessels may be ordered to depart to ensure safe avoidance of the incoming storm. Vessels that are unable to depart the port must contact the COTP to receive permission to remain in port. Vessels with COTP's permission to remain in port must implement their pre-approved mooring arrangement. The COTP may require additional precautions to ensure the safety of the ports and waterways. The COTP may modify the geographic boundaries of the regulated area and actions to be taken under Port Condition X–RAY based on the trajectory and forecasted storm conditions.

(3) *Port Condition YANKEE.* Affected ports are closed to all inbound vessel traffic. All oceangoing tank barges and their supporting tugs and all self-propelled oceangoing vessels over 500 GT must depart the regulated area. The COTP may require additional precautions to ensure the safety of the ports and waterways. The COTP may modify the geographic boundaries of the regulated area within the Delaware Bay COTP Zone and actions to be taken under Port Condition YANKEE based on the trajectory and forecasted storm conditions.

(4) *Port Condition ZULU.* When Port Condition ZULU is declared, cargo operations are suspended, except final preparations that are expressly permitted by the COTP as necessary to ensure the safety of the ports and facilities. Other than vessels designated by the COTP, no vessels may enter, transit, move, or anchor within the regulated area. The COTP may modify the geographic boundaries of the regulated area and actions to be taken under Port Condition ZULU based on the trajectory and forecasted storm conditions.

(5) *Port Condition RECOVERY.* The COTP Zone, or portions of it designated as regulated areas, are closed to all vessels. Based on assessments of channel conditions, navigability concerns, and hazards to navigation, the COTP may permit vessel movements with restrictions. Restrictions may include, but are not limited to, preventing, or delaying vessel movements, imposing draft, speed, size, horsepower, or daylight restrictions, or

directing the use of specific routes. Vessels permitted to transit the regulated area shall comply with the lawful orders or directions given by the COTP or representative.

(6) *Regulated Area Notice.* The Coast Guard will provide notice, via Broadcast Notice to Mariners, Marine Safety Information Bulletins, or by on-scene representatives, of where, within the COTP Zone, a declared Port Condition is to be in effect.

(7) *Exception.* This regulation does not apply to authorized law enforcement agencies operating within the regulated area.

Dated: Sept. 3, 2024.

**Kate F. Higgins-Bloom,**
*Captain, U.S. Coast Guard, Captain of the Port, Sector Delaware Bay.*

[FR Doc. 2024–20391 Filed 9–9–24; 8:45 am]

**BILLING CODE 9110–04–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 63

[EPA–HQ–OAR–2023–0330; FRL–4908.1–02–OAR]

RIN 2060–AV20

## Review of Final Rule Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The EPA is finalizing requirements for sources that reclassify from major source status to area source status under the National Emission Standards for Hazardous Air Pollutants (NESHAP) program. The requirements of this final rule apply to all sources that choose to reclassify after September 10, 2024. The final amendments include a requirement that sources subject to certain major source NESHAP used to meet the Agency's obligations under the Clean Air Act (CAA) for seven specific persistent and bioaccumulative pollutants must remain subject to those NESHAP even if the sources reclassify to area source status. This requirement is based on the EPA's analysis of the statute and of comments received on the EPA's 2023 proposal to amend requirements for NESHAP-regulated sources that choose to reclassify from major to area source status. These final amendments will assure that sources accounting for not less than 90 per centum of the aggregate emissions of each persistent and bioaccumulative hazardous air pollutant (HAP) listed in

CAA remain subject to standards promulgated under the CAA, as the Act requires, and will thereby ensure continued health protections from NESHAP that regulate those HAP. Additionally, we are finalizing clarifications to notification requirements and updating language regarding submittal of confidential business information.

**DATES:** This rule is effective September 10, 2024.

**ADDRESSES:** The U.S. Environmental Protection Agency (EPA) has established a docket for this action under Docket ID No. EPA–HQ–OAR–2023–0330. All documents in the docket are listed on the *https://www.regulations.gov/* website. Although listed, some information is not publicly available, *e.g.,* Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *https://www.regulations.gov/,* or in hard copy at the EPA Docket Center, WJC West Building, Room Number 3334, 1301 Constitution Ave. NW, Washington, DC. The Public Reading Room hours of operation are 8:30 a.m. to 4:30 p.m. Eastern Standard Time (EST), Monday through Friday. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the EPA Docket Center is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** For questions about this final action, contact U.S. EPA, Attn: Nathan Topham, Mail Drop: D243–02, 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711; telephone number: (919) 541–0483; email address: *topham.nathan@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

*Preamble acronyms and abbreviations.* Throughout this action the use of "we," "us," or "our" is intended to refer to the EPA. We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

CAA   Clean Air Act
CRA   Congressional Review Act
CDX   Central Data Exchange
ERT   Electronic Reporting Tool
FR   Federal Register
HAP   hazardous air pollutant(s)
ICR   Information Collection Request
MACT   maximum achievable control technology
MM2A   Major MACT to Area
NESHAP   national emission standards for hazardous air pollutants
NTTAA   National Technology Transfer and Advancement Act
PRA   Paperwork Reduction Act
RFA   Regulatory Flexibility Act
RIN   Regulatory Information Number
tpy   tons per year
UMRA   Unfunded Mandates Reform Act

*Background information.* On September 27, 2023, the EPA proposed revisions to the NESHAP General Provisions of 40 CFR part 63. In this action, we are finalizing certain decisions and revisions for the NESHAP General Provisions based on the 2023 proposal and in response to comments. Other proposed options are still being considered for possible future action, as discussed below. We summarize the comments we timely received regarding aspects of the proposed rule that are directly related to this final rule and provide our responses in this preamble. A "track changes" version of the regulatory language that incorporates the changes in this action is available in the docket.

*Organization of this document.* The information in this preamble is organized as follows:

I. General Information
   A. Does this action apply to me?
   B. Where can I get a copy of this document and other related information?
   C. Judicial Review and Administrative Reconsideration
II. Background
   A. What is the statutory authority for this action?
   B. What actions has the EPA taken under section 112(c)(6)?
   C. What actions has the EPA taken dealing with major source reclassifications?
   D. What did we propose on September 27, 2023, regarding sources choosing to reclassify?
III. What is included in this final rule?
   A. What are the amendments to the General Provisions of 40 CFR part 63 promulgated as part of this action?
   B. What are the effective and compliance dates of the standards?
IV. What is the rationale for our final decisions and amendments for the General Provisions of 40 CFR part 63?
   A. Requirements and Limitations on Reclassification
   B. Other Aspects of the September 2023 Proposal
V. Statutory and Executive Order Reviews
   A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review
   B. Paperwork Reduction Act (PRA)
   C. Regulatory Flexibility Act (RFA)
   D. Unfunded Mandates Reform Act (UMRA)
   E. Executive Order 13132: Federalism
   F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
   G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
   H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
   I. National Technology Transfer and Advancement Act (NTTAA)
   J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing Our Nation's Commitment to Environmental Justice for All
   K. Congressional Review Act (CRA)

## I. General Information

### A. Does this action apply to me?

*Regulated entities.* Categories and entities potentially impacted by this rule include major sources of HAP that are subject to certain major source NESHAP requirements and that reclassify from a major to an area source of HAP pursuant to the requirements in 40 CFR part 63, subpart A, implementing section 112 of the CAA. If you have any questions regarding the applicability of any aspect of this final rule, please contact the appropriate person listed in the preceding **FOR FURTHER INFORMATION CONTACT** section of this preamble.

### B. Where can I get a copy of this document and other related information?

In addition to being available in the docket, an electronic copy of this final action will also be available on the internet. Following signature by the EPA Administrator, the EPA will post a copy of this final action at: *https://www.epa.gov/stationary-sources-air-pollution/reclassification-major-sources-area-sources-under-section-112.* Following publication in the **Federal Register** (FR), the EPA will post the FR version and key technical documents at this same website.

### C. Judicial Review and Administrative Reconsideration

Under CAA section 307(b)(1), judicial review of this final action is available only by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit (the Court) by November 12, 2024. Under CAA section 307(b)(2), the requirements established by this final rule may not be challenged separately in any civil or criminal proceedings brought by the EPA to enforce the requirements established herein.

Section 307(d)(7)(B) of the CAA further provides that only an objection

to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. This section also provides a mechanism for the EPA to reconsider the rule if the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within the period for public comment or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule. Any person seeking to make such a demonstration should submit a Petition for Reconsideration to the Office of the Administrator, U.S. EPA, Room 3000, WJC South Building, 1200 Pennsylvania Ave. NW, Washington, DC 20460, with a copy to both the person(s) listed in the preceding **FOR FURTHER INFORMATION CONTACT** section, and the Associate General Counsel for the Air and Radiation Law Office, Office of General Counsel (Mail Code 2344A), U.S. EPA, 1200 Pennsylvania Ave. NW, Washington, DC 20460.

## II. Background

### A. What is the statutory authority for this action?

The statutory authority for this action is provided by sections 112 and 301 of the CAA, as amended (42 U.S.C. 7401 *et seq.*). Specifically, the EPA is acting pursuant to its general regulatory authority under section 301, and to the specific mandate of section 112(c)(6) of the CAA, which requires the EPA to take action with respect to seven specific, persistent, bioaccumulative HAP. CAA section 112(c)(6) states, "With respect to alkylated lead compounds, polycyclic organic matter, hexachlorobenzene, mercury, polychlorinated biphenyls, 2,3,7,8-tetrachlorodibenzofurans and 2,3,7,8-tetrachlorodibenzo-p-dioxin, the Administrator shall, not later than 5 years after November 15, 1990, list categories and subcategories of sources assuring that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsection (d)(2) or (d)(4) of this section." [1]

CAA section 112(c)(6) requires the EPA to address the seven specific HAPs in two steps. First, CAA section 112(c)(6) requires the EPA to identify

and list the source categories that account for 90% of the total emissions of the seven HAPs. Next, CAA section 112(c)(6) requires the EPA to "assur[e]" that those sources remain subject to the standards the EPA established under CAA sections 112(d)(2) and (d)(4). Per section 301, the EPA has general authority "to prescribe regulations as are necessary to carry out his function under this chapter." *See* 42 U.S.C. 7601(1). Accordingly, the EPA is in this final rule establishing a requirement that the sources in those source categories identified and listed by the EPA under CAA section 112(c)(6) remain subject to the requirements established under CAA section 112(d)(2) or (d)(4), as required by CAA section 112(c)(6), even if any such source reclassifies from a major to an area source after the effective date of the final rule.

Some background on the standards the EPA sets under CAA section 112 is helpful to understand the implications of the CAA section 112(c)(6) requirement. Under section 112 of the CAA the EPA is required to establish emissions standards for "major sources" and "area sources" of HAP to control and reduce their emissions. Section 112(a)(1) defines "major" source, in relevant part, as "any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls,[2] in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants"; and 112(a)(2) defines "area" source, in relevant part, as "any stationary source of hazardous air pollutants that is not a major source." 42 U.S.C. 7412(a)(1) and (2).

Section 112 of the CAA establishes a two-stage regulatory process to develop standards for emissions of HAP from major stationary sources, whereas there is typically a one-stage process to develop standards for area sources. Generally, the first stage for major stationary sources involves establishing standards based on maximum achievable control technology (MACT), and the second stage involves

evaluating the predicted results of those standards to determine whether additional standards are needed to address any remaining risk associated with HAP emissions. This second stage is commonly referred to as the "residual risk review." In addition to the residual risk review, section 112(d)(6) of the CAA also requires the EPA to review major and area source standards set under CAA section 112 every 8 years and revise the standards as necessary, taking into account any "developments in practices, processes, or control technologies." This review is commonly referred to as the "technology review."

In the first stage of the CAA section 112 standard setting process, the EPA promulgates technology-based standards under CAA section 112(d) for categories of sources identified as emitting one or more of the HAP listed in CAA section 112(b). Sources of HAP emissions are either major sources or area sources, and CAA section 112 establishes different requirements for the two types. For major sources, CAA section 112(d)(2) provides that the technology-based NESHAP must reflect the maximum degree of HAP emission reductions achievable (after considering cost, energy requirements, and non-air quality health and environmental impacts). These standards are commonly referred to as MACT standards. CAA section 112(d)(3) also establishes a minimum control level for MACT standards, known as the MACT "floor." For area sources, by contrast, CAA section 112(d)(5) allows the EPA discretion to set standards based either on generally available control technologies or management practices (GACT standards) or on MACT standards. GACT standards are based on typical performance within a source category and are generally less stringent than MACT standards.

For categories of major sources and any area source categories subject to MACT standards, the second stage in standard-setting focuses on identifying and addressing any remaining (*i.e.*, "residual") risk pursuant to CAA section 112(f) and concurrently conducting a technology review pursuant to CAA section 112(d)(6). For categories of area sources subject to GACT standards, there is no requirement to address residual risk, but, similar to the major source categories, the section 112(d)(6) technology review is required.

In addition to the general standard setting and review processes described above, CAA section 112(c)(6) requires the EPA to ensure that sources responsible for 90 percent of the aggregate emissions of each of seven

---

[1] CAA section 112(c)(6) also states that "This paragraph shall not be construed to require the Administrator to promulgate standards for such pollutants emitted by electric utility steam generating units."

[2] "Potential to emit" is defined in the NESHAP General Provisions as "the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the stationary source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is enforceable." See definition in 40 CFR 63.2.

specified pollutants are subject to standards under sections (d)(2) or (d)(4) of this section. 42 U.S.C. 7412(c)(6). To accomplish this, as noted previously, the section required the EPA to list, by November 15, 1995, source categories that account for 90 percent of the aggregate emissions of the listed pollutants, and to promulgate CAA section 112(d)(2) or (4) standards for those source categories by November 15, 2000.

As noted earlier, CAA section 112(d)(2) MACT standards take into consideration costs and non-air quality health and environmental impacts. CAA section 112(d)(4), by contrast, authorizes the EPA to set a health-based standard for a limited set of hazardous air pollutants for which a health threshold has been established, and provides that this health-based standard must provide for "an ample margin of safety." 42 U.S.C. 7412(d)(4). In sum, therefore, CAA section 112(c)(6) specifies that the EPA must list source categories that account for 90 percent of the emissions of the seven listed HAPs and "assure" those sources are subject to MACT or health-based emission standards, rather than the GACT standards that generally apply to area sources. Further, the section ensures that sources subject to these NESHAP are also subject to the additional reviews required for major sources under CAA sections 112(f) and 112(d)(6).

## B. What actions has the EPA taken under CAA section 112(c)(6)?

The EPA has taken several previous actions to identify and list categories and subcategories of sources that account for 90 percent of the aggregate emissions of each of the seven HAP listed in CAA section 112(c)(6). In 1998, the EPA issued a document entitled *Source Category Listing for Section 112(d)(2) Rulemaking Pursuant to Section 112(c)(6) Requirements,* 63 FR 17838, 17839 (April 10th, 1998). In that document, the EPA explains how it developed a 1990 base-year emissions inventory for the seven HAP enumerated in section 112(c)(6) of the CAA and used that inventory as the baseline for determining whether 90 percent of those emissions are subject to standards. In the same document, based on that inventory, the EPA identified source categories that, cumulatively, met the 90 percent requirement in CAA section 112(c)(6). That is, the EPA determined that emissions from the listed source categories accounted for 90 percent of the total emissions of the seven listed HAP, as of the base-year emissions inventory.

That 1990 baseline inventory and the category listing have undergone several updates since their initial publication in 1998. For example, in a document dated November 8, 2002, the EPA identified 5 area source categories that were no longer needed to meet the 90 percent requirement of CAA section 112(c)(6). *National Emission Standards for Hazardous Air Pollutants: Revision of Source Category List for Standards Under Section 112(c)(6) and 112(k) of the Clean Air Act,* 67 FR 68124 (2002).[3] Further, in the same document, the EPA removed the Open Burning of Scrap Tires source category from the 1990 baseline inventory. Due to the impact these updates had on the inventory, the EPA promulgated emission standards for several additional source categories,[4] while determining that certain other categories or subcategories are not necessary to meet the 90 percent requirement under CAA section 112(c)(6).

In 2001, Sierra Club filed suit in the U.S. District Court for the District of Columbia asserting, among other allegations, that the EPA had failed to promulgate emission standards sufficient to satisfy the 90 percent requirement in CAA section 112(c)(6). *See Sierra Club* v. *Jackson,* No. 01–1537 (D.D.C.). In an order issued March 31, 2006 ("2006 order"), the district court set a deadline (later extended) for the EPA to complete that task. *Sierra Club* v. *Johnson,* 444 F. Supp. 2d 46, 59 (D.D.C. 2006). In the course of that suit, the EPA explained that "once [it] completes emission standards for the remaining source categories under section 112(c)(6), it intends to issue a document that explains how it has satisfied the requirements of section 112(c)(6) in terms of issuing emission standards for the source categories that account for the statutory thresholds identified in section 112(c)(6)." *Id.*

On March 21, 2011, having promulgated standards sufficient to meet the 90 percent requirement under CAA section 112(c)(6), the EPA published a document in the **Federal Register** announcing it had met its statutory obligation. *Completion of Requirement to Promulgate Emission*

*Standards,* 76 FR 15308 (March 21, 2011). The March 21, 2011, document contained the EPA Administrator's conclusion that the "EPA has completed sufficient standards to meet the 90-percent requirement under . . . section 112(c)(6)" (76 FR 15308). The Administrator based that determination on a technical memorandum "document[ing] the actions the Agency has taken to meet these requirements." *Id.* The technical memorandum, entitled *Emission Standards for Meeting the Ninety Percent Requirement under Section 112(c)(6) of the Clean Air Act* and available at Docket ID No.: EPA–HQ–OAR–2004–0505, included an updated 1990 baseline inventory, an updated list of the source categories necessary to meet the 90 percent requirement, and a list of emission standards the EPA has promulgated for these source categories.

In 2011, Sierra Club filed suit in U.S. Court of Appeals for the District of Columbia (D.C. Circuit) challenging the March 21, 2011, document. The D.C. Circuit vacated the document, holding that the document was a legislative rulemaking that must be issued through a notice and comment rulemaking. *Sierra Club* v. *EPA,* 699 F.3d 530, 535 (D.C. Cir. 2012). In 2013, Sierra Club filed a motion with the district court, seeking enforcement of the 2006 order. In an opinion dated July 25, 2014, the district court held that the EPA failed to comply with the 2006 order and directed the EPA to initiate a process of notice and comment rulemaking before the Agency reissues, reconsiders or modifies its determination regarding CAA section 112(c)(6).

Therefore, the EPA issued a proposed rule on December 16, 2014 (79 FR 74656), as ordered by the D.C. Circuit, and provided an opportunity for comment on the EPA's proposed determination that it had fulfilled the requirements of CAA section 112(c)(6). On June 3, 2015, the EPA issued a **Federal Register** document finalizing the EPA's determination that the Agency had promulgated a sufficient number of section 112(d)(2) and (d)(4) emissions standards to satisfy the CAA section 112(c)(6) requirement that sources accounting for not less than 90 percent of the aggregate emissions of seven specific HAP be subject to standards under CAA sections 112(d)(2) or 112(d)(4) (80 FR 31470).[5] As of the

---

[3] Section 112(k) of the CAA requires the EPA in relevant part to "identify not less than 30 hazardous air pollutants which, as the result of emissions from area sources, present the greatest threat to public health in the largest number of urban areas," and to "assure that sources accounting for 90 per centum or more of the aggregate emissions of each of the 30 identified hazardous air pollutants are subject to standards" under CAA section 112(d).

[4] The EPA concluded in 2015 that sufficient standards had been promulgated to reach the 90 percent thresholds and does not reopen that conclusion here.

[5] Following a challenge to the 2015 rule, the court remanded the record to the EPA for explanation of its reliance on surrogates. In that case, the court remanded the rule so the EPA could provide additional information about the how the chosen surrogates relate to the CAA section 112(c)(6) HAP

2015 final rule, therefore, the EPA determined that it had "assur[ed]" that "sources accounting for not less than 90 per centum of the aggregate emissions of" the seven HAP enumerated in CAA section 112(c)(6) are "subject to standards under subsection (d)(2) or (d)(4)." 42 U.S.C. 112(c)(6).

## C. What actions has the EPA taken dealing with major source reclassifications?

Shortly after the EPA began promulgating individual NESHAP following the 1990 CAA Amendments, the Agency received multiple requests to clarify when a major source of HAP could avoid CAA section 112 requirements applicable to major sources by taking enforceable limits to constrain its emissions below the major source thresholds and reclassifying as an area source. In response, the EPA issued a 1995 memorandum, referred to as the "1995 Seitz Memorandum,"[6] which provided guidance on timing issues related to avoidance of CAA section 112 requirements for major sources.

In the 1995 Seitz Memorandum, the EPA interpreted the relevant statutory language under CAA section 112 to find that facilities that are major sources of HAP may switch to area source status at any time until the "first compliance date" of the standard.[7] Under this interpretation, facilities that met the major source definition on the first substantive compliance date of an applicable major source NESHAP were required to continue to comply with that major source NESHAP even if the source subsequently became an area source by taking physical or operational limitations on the source's capacity to emit. This position was commonly referred to as the "Once In, Always In" (OIAI) policy.

On January 25, 2018, the EPA issued a memorandum from William L. Wehrum, Assistant Administrator of the Office of Air and Radiation, to the EPA Regional Air Division Directors, withdrawing the OIAI policy.[8] That memorandum, titled "Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act" and referred to as the Major MACT to Area (MM2A) Memorandum, discussed the statutory provisions that govern when a facility subject to major source NESHAP requirements under section 112 of the CAA may reclassify as an area source and, so long as it remains below the major source thresholds, avoid major source NESHAP requirements and other requirements applicable to major sources under CAA section 112.[9]

In the MM2A Memorandum, the EPA announced the future publication of a proposed rule to solicit input from the public on regulatory revisions needed to be consistent with the reading of the statute described in the Memorandum. On July 26, 2019, the EPA proposed regulatory text to implement the reading of the statute discussed in the MM2A Memorandum.[10]

The EPA published the 2020 MM2A final rule (85 FR 73854) on November 19, 2020. The rule formalized the withdrawal of the OIAI policy from the 2018 MM2A Memorandum and codified that a major source can reclassify to area source status at any time upon reducing its emissions and potential to emit HAP to below the CAA section 112 major source thresholds.

## D. What did we propose on September 27, 2023, regarding sources choosing to reclassify?

In September 2023, the EPA proposed to add requirements under the NESHAP program for sources seeking to reclassify from major source status to area source status. See 88 FR 66336, September 27th, 2023. The aim of this proposal was to provide safeguards to prevent reclassified sources from increasing their emissions beyond the major source NESHAP requirements applicable at the time of reclassification. Specifically, the EPA proposed to codify in a new paragraph, 40 CFR 63.1(c)(6)(iv), that any major source choosing to reclassify to area source status must implement one of the following control methods or a combination: (1) continue to employ the emission control methods (e.g., control device and/or emission reduction practices) required under the major source NESHAP requirements, including previously approved alternatives under the applicable NESHAP and associated monitoring, recordkeeping, and reporting (MRR); (2) comply with the control methods prescribed for reclassification under a specific NESHAP subpart; or (3) install and operate the emission controls that the permitting authority has reviewed and approved as ensuring the emissions of HAP from units or activities previously covered will not increase above the emission standard or level that was required under the major source NESHAP requirements at the time of reclassification. For this last option, the proposal would have required the record of the permitting authority decision to identify the specific units and control methods and include the data and analysis for the emission controls as well as the determination that MRR is adequate to assure compliance.

In addition to the safeguards, the EPA also proposed that limits taken by sources to reclassify from major to area sources must be federally enforceable as a condition of reclassification.[11] Specifically, we proposed to codify in a new paragraph, 40 CFR 63.1(c)(6)(iii), that, as a condition of reclassification, any limitations taken by a major source or required by a permitting authority to reclassify to area source status must be federally enforceable. The EPA decided not to propose edits to the definition of PTE under 40 CFR 63.2, opting rather to address the PTE definitions in the New Source Review, Title V, NESHAP, and related programs in a separate rulemaking or guidance at a later date.

Additionally, in light of the special attention Congress paid to specific pollutants in section 112(c)(6) of the CAA, we sought comment on whether additional restrictions are warranted for source categories that are subject to standards under CAA section 112(d)(2) or 112(d)(4) for the persistent and bioaccumulative HAP listed in CAA section 112(c)(6). Specifically, we sought comment on whether any of the following additional restrictions are warranted to achieve Congress' directive that source categories emitting these HAP be subjected to MACT standards under CAA section 112(d)(2) or (d)(4). First, we sought comment on restricting any sources[12] that are subject to a major source NESHAP and that are included

---

being regulated by the NESHAP. *Sierra Club* v. *EPA*, 863 F.3d 834 (D.C. Cir. 2017).

[6] "Potential to Emit for MACT Standards—Guidance on Timing Issues," from John Seitz to the EPA Regional Air Division Directors (May 16, 1995) ("1995 Seitz Memorandum") (available in the docket for this action).

[7] Per the 1995 memo, the "first substantive compliance date" was defined as the first date a source must comply with an emission limitation or other substantive regulatory requirement (*i.e.,* leak detection and repair programs, work practice measures, etc., but not a notice requirement) in the applicable standard.

[8] See notice of issuance of this guidance memorandum at 83 FR 5543 (February 8, 2018).

[9] 40 CFR 63.6(a)(2) states: "If an area source that otherwise would be subject to an emission standard or other requirement established under this part if it were a major source subsequently increases its emissions of hazardous air pollutants (or its potential to emit hazardous air pollutants) such that the source is a major source, such source shall be subject to the relevant emission standard or other requirement".

[10] See 84 FR 36304 (July 26, 2019).

[11] 40 CFR 63.2 defines "federally enforceable" in relevant part as "all limitations and conditions that are enforceable by the Administrator and citizens under the Act or that are enforceable under other statutes administered by the Administrator."

[12] See EPA–HQ–OAR–2004–0505–0010 for a list of source categories and corresponding NESHAP subparts used to reach the 90 percent threshold. See table 1.1 of EPA–HQ–OAR–2004–0505–0006 for the CAA section 112(c)(6) emission inventory.

in the EPA's 90 percent list for any of the CAA section 112(c)(6) HAP from reclassifying from major to area source status. Second, we sought comment on requiring sources subject to a major source NESHAP to remain subject to that NESHAP for emissions of the section 112(c)(6) HAP even if those sources reclassify and no longer remain subject to the major source NESHAP for emissions of non-112(c)(6) HAP. Third, we considered allowing such sources to reclassify but requiring them to "continue to employ the emission control methods (*e.g.,* control device and/or emission reduction practices) required under the major source NESHAP requirements, including previously approved alternatives under the applicable NESHAP and associated monitoring, recordkeeping, and reporting (MRR)." See 88 FR at 66346. Finally, we sought comment on whether any other restrictions on sources or source categories emitting CAA section 112(c)(6) HAP may be warranted.

## III. What is included in this final rule?

*A. What are the amendments to the General Provisions of 40 CFR part 63 promulgated as part of this action?*

This action amends the General Provisions of 40 CFR part 63 to require sources subject to certain major source NESHAP subparts to remain subject to those NESHAP regardless of whether they reclassify to area source status. Specifically, after September 10, 2024, sources that are subject to the NESHAP used to reach the 90 percent requirements articulated in CAA section 112(c)(6) as of September 10, 2024 must remain subject to such NESHAP even if they reclassify to area source status. Additionally, this final rule makes minor amendments to reporting requirements for submission of confidential business information and clarifies what notifications for a reclassifying facility must contain.

The EPA intends for these two actions to be severable from one another. Specifically, the EPA separately analyzed and determined the appropriateness of requirements for those sources that are subject to NESHAP used to reach the 90 percent threshold requirements in CAA section 112(c)(6), and of the unrelated minor amendments and clarifications to notification and reporting requirements for sources that reclassify. Each of the requirements in this final rule is functionally independent, such that each may operate independently of the other. Thus, the EPA has independently considered and adopted each portion of this final rule, and each is severable

should there be judicial review. If a court were to invalidate either one of these elements, the EPA intends the remainder of this action to remain effective.

Importantly, we have designed the different elements of this final rule separately and each can function sensibly and independently. Specifically, the requirement for sources to remain subject to NESHAP listed under CAA section 112(c)(6) will operate independently and is in no way impacted by the separate clarifications to reporting requirements for sources that reclassify, and vice versa. Further, the supporting bases for each element of the final rule reflect the Agency's judgment that the element is independently justified and appropriate, and that each element can function independently even if one or more other parts of the rule has been set aside.

*B. What are the effective and compliance dates of the standards?*

The revisions to General Provisions of 40 CFR part 63 being promulgated in this action are effective on September 10, 2024.

## IV. What is the rationale for our final decisions and amendments for the General Provisions of 40 CFR part 63?

For each issue, this section provides a description of what we proposed and what we are finalizing for the issue, the EPA's rationale for the final decisions and amendments, and a summary of key comments and responses.

*A. Requirements and Limitations on Reclassification*

1. What requirements and limitations were in the proposal for sources choosing to reclassify?

As described in section II.C. of this preamble, the EPA proposed to add requirements for sources that reclassify from major to area source status. This included proposed requirements for reclassified sources to take federally enforceable limits on their potential to emit, and for reclassified sources to maintain the MACT-level controls even after reclassification, which were termed "safeguards." The EPA also sought comment on whether there should be additional restrictions on sources that emit specific pollutants covered by CAA section 112(c)(6).

2. What has changed since proposal?

In the 2023 proposal, the EPA noted that the proposed "safeguards" would prevent emission increases from sources that elect to reclassify, and the EPA sought comment on whether additional measures or limitations were needed for

source categories that are subject to standards under CAA section 112(d)(2) or 112(d)(4) for HAP listed pursuant to CAA section 112(c)(6).

The EPA is not, at this time, finalizing the proposed safeguards. During the public comment period, the EPA received substantial comments regarding the proposed safeguard requirements, and the EPA is still evaluating those comments. Because the issue requires more study, the EPA is leaving the 2023 proposal open as we assess finalizing a rule based on that aspect of the proposal. The EPA continues to be concerned about the possibility of sources reclassifying and then increasing emissions above the levels previously allowed under the applicable NESHAP. Therefore, the EPA continues to consider comments on the 2023 proposal and is working to develop solutions to prevent emissions backsliding. As discussed in the 2023 proposal, the EPA recognizes that backsliding would not be consistent with the intent or spirit of the Act.

In the interim, the EPA finds there is sufficient clarity in the language of CAA section 112(c)(6) and in related public comments submitted on the proposed rule to finalize a requirement that sources in source categories used to satisfy that section's 90-percent threshold must remain subject to the relevant NESHAP even if they reclassify to area source status.[13] This action addresses the EPA's obligation under CAA section 112(c)(6) to assure sources from the listed source categories are subject to CAA section 112(d)(2) or (d)(4) controls.

The EPA is continuing to evaluate whether additional actions are warranted to mitigate the impacts of the 2020 MM2A final rule, including to address the potential that sources may reclassify and then increase HAP emissions above the levels allowed under the applicable NESHAP. Since the EPA is only taking final action with respect to a limited aspect of the September 2023 proposal, we are only responding to comments related to the aspects of the proposal that we are finalizing in this action.[14] The EPA continues to consider other aspects of the 2023 proposal, including safeguards and federal enforceability for limits

---

[13] We note that a small number of the NESHAP used for meeting the 90 percent threshold are NESHAP that apply to area sources. For these NESHAP, covered sources that are already area sources are not affected by this rule, because those sources are subject to standards under CAA section 112(d)(2) or (d)(4), notwithstanding the fact that they are area sources.

[14] We have included a list of comments that are within scope for the final rule in the docket for this action, Docket ID No.: EPA–HQ–OAR–2023–0330.

used to support reclassification of sources. We will respond to the remaining comments when we take final action on other aspects of the September 2023 proposal.

3. What comments did we receive on the interaction of CAA section 112(c)(6) and limits for sources choosing to reclassify, and what are our responses?

*Comment:* Several commenters agreed with the EPA that the reclassification of sources that agree to keep their aggregate emissions of hazardous air pollutants below the major source threshold should not result in those sources avoiding compliance with the MACT standards for the seven persistent and bioaccumulative air toxics listed in CAA section 112(c)(6). The commenters suggested that allowing sources that reclassify to avoid the CAA section 112(c)(6) MACT requirements would defeat one of the primary purposes of the Act's air toxics provisions, which is to ensure sources that emit these specific pollutants are subject to the most protective standards possible. Several commenters argued that maintaining the requirements placed on these sources through the NESHAP program will ensure that the EPA meets Congress' directive and ensures continued protection of public health.

One commenter argued that the EPA is legally required to include a restriction to expressly prevent reclassification by sources subject to a major source NESHAP used to reach the 90 percent threshold for the specific pollutants listed in CAA section 112(c)(6), because that threshold reflects Congressional expectations on the scope of program coverage for specified pollutants, and the EPA cannot now ignore CAA section 112(c)(6). The commenter asserted that the EPA has authority to impose restrictions to protect overall NESHAP program integrity. Specifically, the commenter asserted the EPA should account for the fact that NESHAP standards, including those developed for CAA section 112(c)(6), were developed and implemented for decades without any considered design of allowing major sources to drop from major source NESHAP regulation. The commenter also asserted that the EPA has full authority to disallow reclassification by sources that were relevant to satisfaction of CAA section 112(c)(6) requirements, and the EPA may choose to disallow this on a temporary basis at least until a future program review is completed on the impacts of the MM2A final rule, which could be combined with future rulemakings to ensure that area source

standards are developed or strengthened to align with their major source NESHAP categories.

*Response:* As discussed further in section IV.A.4. of this preamble, the EPA agrees with commenters that CAA section 112(c)(6) obligates the EPA to assure sources accounting for 90 percent of emissions of seven specific HAP remain subject to standards under sections 112(d)(2) or (d)(4) of the CAA. Allowing the sources subject to the NESHAP used to reach the 90 percent thresholds for these pollutants to reclassify and thereby avoid complying with those NESHAP would undermine the statutory mandate to "assur[e]" that the sources regulated under CAA section 112(c)(6) remain subject to standards under CAA section 112(d)(2) or 112(d)(4). In this final rule, the EPA is adding a restriction to the General Provisions of 40 CFR part 63 that will require sources that are subject to the NESHAP used to reach the CAA's 90 percent requirements for CAA section 112(c)(6) as of September 10, 2024 to remain subject to those specific major source NESHAP subparts regardless of whether they reclassify to area source status after September 10, 2024.

*Comment:* One commenter argued that the 2020 MM2A rule eliminated the EPA's ability to ensure sources subject to previously promulgated standards continue to comply with MACT standards. Therefore, the commenter claimed that CAA section 112(c)(6) requires the Agency prevent any sources within the categories the EPA has used to reach the statutory 90-percent threshold for any of the CAA section 112(c)(6) HAP from reclassifying from major source status to area source status, because in the commenter's view, reclassification would allow the sources to increase their emissions above the levels allowed in the applicable NESHAP.

Two commenters argued that the language of CAA section 112(c)(6) requires the EPA to assure that a minimum of 90 percent of emissions of each pollutant are subject to MACT standards, and that the standards must be MACT limits promulgated under CAA section 112(d)(2) and not substitute restrictions adopted under other authorities. One commenter noted, for example, there are no health thresholds enabling the use of standards under CAA section 112(d)(4) for the pollutants listed in CAA section 112(c)(6).

Two commenters noted that CAA section 112(c)(6) creates an independent mandate that comprises both listing sources and promulgating standards (*Sierra Club* v. *EPA,* 699 F.3d 530, 531

(D.C. Cir. 2012)) and thereby imposes a substantive duty to issue CAA section 112(c)(6) standards, and to undertake any additional source-listing or standard setting required to reach the 90 percent threshold. *Id.* at 535. The commenters also noted that the CAA eliminates any prerequisite that the EPA make "a finding of health or environmental threat from area sources to determine if such sources need to be included to meet the 90 percent requirement" (63 FR 17,838, 17,842 (April 10, 1998)) and also requires the EPA "to establish and subject these listed sources to MACT standards, . . . even if it would have otherwise had the discretion to apply a less-stringent standard to any area sources on the list." (*Sierra Club* v. *EPA,* 863 F.3d 834, 835 (D.C. Cir. 2017) (Sierra Club II).)

One commenter noted that the EPA has purported to satisfy those duties by listing and promulgating standards for a series of source categories that contain the sources accounting for 90 percent of the aggregate emissions of each of the seven pollutants listed in CAA section 112(c)(6). The commenter also noted, however, that these source categories also include hundreds of sources that the EPA predicts could be eligible for reclassification based on the EPA's analysis of the categories and sources that the EPA believes likely to achieve cost savings by escaping MACT. (EPA–HQ–OAR–2023–0330–0020). The commenter concluded that the EPA lacks the statutory authority to exempt sources from MACT standards within the categories it has identified as necessary to satisfy CAA section 112(c)(6)'s mandate.

Two commenters stated that the EPA should confirm that because sources in the categories on its CAA section 112(c)(6) list are minimally necessary to satisfy CAA section 112(c)(6)'s independent requirements, the Agency cannot allow those sources to escape MACT standards, and the EPA should finalize a rule requiring sources in those categories to continue to comply with MACT standards regardless of whether their post-compliance emissions exceed the major-source threshold. The commenters stated that otherwise the 2020 MM2A rule, even with the additional safeguards contained in the 2023 MM2A proposal, would be flatly inconsistent with CAA section 112(c)(6).

*Response:* The EPA agrees that CAA section 112(c)(6) requires the EPA to assure that sources accounting for 90 percent of the aggregate emissions of the HAP listed in CAA section 112(c)(6) are subject to standards under CAA sections 112(d)(2) or 112(d)(4). The EPA is promulgating a requirement that assures

that outcome for sources subject to the NESHAP used reach the 90 percent thresholds required by CAA section 112(c)(6). See section IV.A.4 for discussion of the EPA's rationale for the promulgated requirement. Such sources may still reclassify from major to area source status, but they must remain subject to the NESHAP used to assure that 90 percent of the emissions of the section 112(c)(6)-listed HAP are subject to standards under CAA section 112(d)(2) or 112(d)(4).

*Comment:* One commenter argued that the EPA also has authority, and an obligation, to adopt the proposed restriction to prevent CAA section 112(c)(6) sources from reclassifying as a necessary revision under CAA section 112(d)(6) under the decision in *Louisiana Environmental Action Network* v. *EPA,* 955 F.3d 1088, 1099 (D.C. Cir. 2020), which found that CAA section 112(d)(6) obligates the EPA to revise standards to correct "unlawfully omitted" controls. The commenter also asserted that the statutory authority for restricting reclassification for CAA section 112(c)(6) sources is independent and severable of those supporting the EPA's other proposed safeguards.

*Response:* The EPA agrees that the statutory authority under CAA section 112(c)(6) is distinct from the EPA's authority for proposed safeguards. However, the EPA does not agree that CAA section *112(d)(6)* requires the amendments included in this final rule. *Louisiana Environmental Action Network* v. *EPA,* 955 F.3d 1088 (D.C. Cir. 2020) requires the EPA to address regulatory gaps when the EPA undertakes a CAA section 112(d)(6) technology review, such as establishing missing MACT standards for listed air toxins known to be emitted from a particular source category. In this rule, the EPA has determined that CAA section 112(c)(6) obligates the EPA to assure that sources subject to the NESHAP used to establish 90 percent thresholds under that provision remain subject to those NESHAP, such that the sources in that source category remain in the pool of sources evaluated pursuant to the reviews conducted under CAA sections 112(f) and 112(d)(6). However, this authority under CAA section 112(c)(6) is distinct from the EPA's gap-filling obligation in promulgating technology reviews under CAA section 112(d)(6) pursuant to *Louisiana Environmental Action Network* v. *EPA,* 955 F.3d 1088 (D.C. Cir. 2020). See section IV.A.4. of this preamble for discussion of our rationale and statutory authority.

*Comment:* One commenter urged the EPA to require reclassified sources to

continue to comply with HAP-specific MACT standards and asserted that those sources should not be allowed to characterize as "controls" measures that would produce an increase in any HAP. The commenter noted that many of the regulated HAP are harmful in extraordinarily small quantities and are specifically listed in CAA section 112(c)(6), whereas other HAP are not. The commenter predicted that aggregate limits, even for sources outside the scope of CAA section 112(c)(6), would allow for dangerous increases in toxics that are only ever emitted in very small quantities, and of which affected communities would have no knowledge.

*Response:* As discussed further in section IV.A.4. of this preamble, the EPA has determined that given the special attention paid by Congress to the specific HAP included in CAA section 112(c)(6), the agency must disallow sources subject to NESHAP used to meet the 90 percent requirement of CAA section 112(c)(6) from avoiding compliance with those NESHAP through reclassification. Therefore, such sources must remain subject to those NESHAP, regardless of whether they reclassify to area source status.

However, the EPA is not at this time finalizing the proposed safeguards. During the public comment period, the EPA received substantial comments regarding the proposed safeguard requirements, and the EPA is still evaluating those comments. Because the issue requires more study, the EPA is leaving the proposal open as the EPA assesses finalizing a rule based on that aspect of the 2023 proposal. The EPA continues to be concerned about the possibility of sources increasing emissions as a result of reclassification and continues to consider comments on the 2023 proposal. In the interim, to address this concern in part, the EPA finds there is sufficient clarity regarding a subset of MACT-subject sources— those in categories relied on to satisfy CAA section 112(c)(6)—to justify acting now by finalizing a requirement for CAA section 112(c)(6)-affected sources to remain subject to the specific NESHAP that are used to meet the 90 percent thresholds under CAA section 112(c)(6) regardless of whether the sources reclassify.

*Comment:* Two commenters stated that allowing facilities to reclassify does not jeopardize the EPA's original goal of regulating 90 percent of the emissions of CAA section 112(c)(6) HAP because only 200 facilities have reclassified since the EPA changed its policy towards reclassification (see 88 FR 66349). One commenter added that those reclassifications do not

automatically result in an increase in HAP emissions to just under the major source thresholds from detuning of controls.

*Response:* As discussed in section IV.A.4. of this preamble, the EPA has determined that allowing sources that reclassify to avoid the NESHAP used to meet the statutory requirement of CAA section 112(c)(6) is inconsistent with the Congressional mandate that the EPA "assur[e]" sources accounting for 90 percent of the emissions of the seven specific HAP listed in CAA section 112(c)(6) are subject to standards under CAA sections 112(d)(2) or 112(d)(4). Therefore, the EPA is finalizing a requirement that sources subject to these NESHAP must continue to comply even if the sources reclassify to area source status. The EPA disagrees with the commenter that such a restriction would only be justified if there were past evidence of sources' taking advantage of reclassification to increase their emissions to just below the major source thresholds. Congress clearly intended sources in the section 112(c)(6) source categories to continue to be subject to CAA section 112(d)(2) or (d)(4) standards, rather than GACT standards or whatever other standards (if any) apply to area sources in the source category. The EPA disagrees with the comment that we can assume that source categories required to reach the 90 percent threshold in CAA section 112(c)(6) will continue to be subject to standards under CAA sections 112(d)(2) or (d)(4) merely because there have not been a large number of reclassifications to date. The number of reclassifications to date is not relevant to ensuring that the EPA meets the statutory requirement in CAA section 112(c)(6). This action seeks to assure that sources subject to the NESHAP used to meet the statutory 90 percent requirement remain subject to standards under CAA sections 112(d)(2) or 112(d)(4), as CAA section 112(c)(6) requires. As discussed further in section IV.A.4. of this preamble, the EPA finds this action is needed to meet the Agency's statutory obligation to "assure" that sources that account for 90 percent of the emissions of the seven HAP listed in CAA section 112(c)(6) remain subject to standards under CAA section 112(d)(2) or 112(d)(4), given that the 2020 MM2A rule would otherwise permit such sources to reclassify to area source status and no longer be subject to major source NESHAP requirements.

*Comment:* One commenter argued that the EPA should not adopt additional restrictions on MM2A for sources of persistent and bioaccumulative HAP under CAA section 112(c)(6) because the proposed

''safeguards'' in the 2023 proposal are sufficient without further restrictions. The commenter asserted that if the 2020 MM2A rule operates properly, it should incentivize major sources to become area sources, through the adoption of innovative pollution control strategies— whether those are based on elements of existing major source NESHAP or are based on technological or material breakthroughs.

*Response:* The EPA has determined that the final amendments are required by CAA section 112(c)(6). The EPA is not at this time finalizing the proposed safeguards. During the public comment period, the EPA received substantial comments regarding the proposed safeguard requirements, and the EPA is still evaluating those comments. Because the issue requires more study, the EPA is leaving the proposal open as the EPA assesses finalizing a rule based on that aspect of the 2023 proposal. The EPA continues to be concerned about the possibility of sources increasing emissions as a result of reclassification and continues to consider comments on the 2023 proposal. In the interim, to address this concern in part, the EPA finds there is sufficient clarity regarding a subset of MACT-subject sources— those in categories relied on to satisfy CAA section 112(c)(6)—to justify acting now by finalizing a requirement for CAA section 112(c)(6)-affected sources to remain subject to the specific NESHAP that are used to meet the 90 percent thresholds under CAA section 112(c)(6) regardless of whether the sources reclassify.

*Comment:* One commenter argued that the EPA has no authority to impose constraints on reclassification under CAA section 112(c)(6). The commenter asserted that the CAA section 112(c)(6) requirement for the EPA to list and regulate a sufficient number of source categories to ''assur[e] that sources accounting for not less than 90 per centum of the aggregate emissions of each pollutant [listed under CAA section 112(c)(6)] are subject to standards under subsection (d)(2) or (d)(4)'' is unambiguously a one-time requirement. The commenter argued that it does not impose any obligation on the EPA to monitor the regulated source categories and make adjustments over time to maintain the 90 percent requirement. Similarly, the commenter asserted this provision imposes no obligation on affected sources to continue to comply with a NESHAP that the EPA relied upon in making the 90 percent determination. The commenter added it would be unreasonable in any event to construe the statute as imposing such obligations because the

EPA would forever have to track the number of affected sources, the emissions of such affected sources, and changes to those sources that might affect the EPA's prior 90 percent determination, and the EPA would be required to adjust existing emissions standards or impose new emissions standards to maintain 90 percent coverage.

*Response:* This rule does not revisit the 2015 determination that sufficient source categories have been subjected to standards under CAA sections 112(d)(2) or (d)(4) to satisfy the section 112(c)(6) 90 percent requirement. However, as discussed further in section IV.A.4., the EPA has determined that the CAA requires that the EPA set standards sufficient to ''assure'' that sources in the categories and subcategories used to reach the 90 percent threshold are subject to section 112(d)(2) or (d)(4) standards. The EPA's determination of which NESHAP are necessary to achieve the 90 percent thresholds was made prior to the MM2A rulemaking, at a time when major sources, under the OIAI policy, were required to continue to comply with previously applicable major source NESHAP, even if the sources reduced emissions below major source thresholds. Allowing for sources subject to the NESHAP required to meet the 90 percent threshold to no longer be subject to these standards is contrary to the Agency's obligation to ''assur[e]'' those sources remain subject to standards under CAA sections 112(d)(2) or (4). The limitation promulgated today implements the statutory requirement under CAA section 112(c)(6) to assure source categories accounting for 90 percent of the aggregate emissions of the specific listed HAP are subject to CAA section 112(d)(2) or (d)(4) standards. Congress could not have envisioned requiring the EPA to list and regulate categories and subcategories of sources, and to assure those categories and subcategories of sources are subject to standards under CAA section 112(d)(2) and 112(d)(4), only to have those sources reclassify and avoid the standards that Congress explicitly required the EPA to establish for these source categories. Therefore, we have determined that even if a facility reclassifies, the sources at the facility that are subject to these NESHAP must remain subject, to assure they are subject to standards under CAA sections 112(d)(2) or 112(d)(4), as required by CAA section 112(c)(6).

*Comment:* A commenter opposed the option the EPA requested public comment on that would require sources to comply with the applicable major source standards for the seven HAP

listed in CAA section 112(c)(6) while allowing sources to reclassify for other HAP. The commenter acknowledged that the EPA has the authority to apply GACT instead of MACT standards for area source emissions of pollutants other than the seven HAP listed in CAA section 112(c)(6). However, the commenter asserted that the EPA did not adequately justify why GACT standards would be more appropriate than MACT for all source categories rather than the rule-specific decisions the EPA has made in the past when developing MACT standards for area source standards promulgated under CAA section 112(c)(6) and GACT standards for other HAP from those area source categories. In addition, the commenter explained that this option would be impractical because the EPA relies on surrogates for the seven HAP listed in CAA section 112(c)(6), and there is no rule-specific analysis that could be used to support a pollutant-by-pollutant reconciliation of the 2020 MM2A Rule with the CAA section 112(c)(6) requirements for each pollutant. The commenter argued that the EPA did not explain how this proposed option would support Congress' goals of reducing HAP emissions and associated public health risks from these pollutants. Therefore, the commenter recommended that the EPA prevent CAA section 112(c)(6) listed sources from reclassifying as area sources for all HAP.

Similarly, another commenter emphasized that if the EPA does not completely repeal the 2020 MM2A rule, the EPA should not allow sources of the seven HAP listed in CAA section 112(c)(6) to reclassify as area sources and avoid the required emission reductions because the CAA specifically requires the EPA to ensure that 90 percent of the aggregate emissions for each pollutant are reduced to the maximum degree achievable.

*Response:* The EPA agrees with the commenter that it would not be appropriate to require sources of the seven HAP listed in CAA section 112(c)(6) to continue to comply only with standards addressing those CAA section 112(c)(6) HAP while no longer complying with other parts of the same NESHAP that do not directly address the 112(c)(6) HAP. As the commenter states, many of these NESHAP regulate the CAA section 112(c)(6) HAP through surrogates and it would be impractical to attempt to bifurcate compliance with a NESHAP. There is often a large degree of overlap in the controls, monitoring, recordkeeping, and reporting requirements that deal with CAA section 112(c)(6) HAP and other HAP. It

would create unnecessary burden and confusion to require sources to separate emissions of CAA section 112(c)(6) HAP from other pollutants. As explained further in section IV.A.4. below, the EPA finds that CAA section 112(c)(6) requires that while sources subject to NESHAP used for 112(c)(6) can still reclassify under the 2020 MM2A rule for purposes of other NESHAP not used to meet the CAA section 112(c)(6) requirements, those sources must continue to comply with all aspects of the CAA section 112(c)(6)-listed NESHAP regardless of whether they reclassify to area source status.

*Comment:* Several commenters asked the EPA to not allow major source emitters of mercury, dioxins, and PCBs and the other persistent and bioaccumulative pollutants listed in CAA section 112(c)(6) to reclassify as area sources, increase HAP emissions, and avoid monitoring and reporting requirements. Another commenter recommended that the EPA require all sources that emit persistent, bioaccumulative, or highly toxic HAP to follow the applicable NESHAP's emission control methods and monitoring, recordkeeping, and reporting requirements. One commenter emphasized that sources must comply with standards under CAA section 112(d)(2), and the EPA must not allow substitute standards, which could result in higher HAP emissions.

*Response:* The EPA agrees with commenters that sources used to meet the CAA's requirement to subject sources of 90 percent of the aggregate emissions of the HAP listed in 112(c)(6) should remain subject to those NESHAP, regardless of whether they reclassify to area source status. See section IV.A.4. for further discussion of our rationale.

4. What is the rationale for our final approach for CAA 112(c)(6) sources?

In this action, the EPA is finalizing requirements specific to CAA section 112(c)(6)-affected source categories. Specifically, to fulfill the EPA's statutory obligation to assure that sources accounting for 90 percent of the emissions of the seven HAP listed in section 112(c)(6) are subject to standards under CAA section 112(d)(2) or 112(d)(4), the EPA is requiring that such sources remain subject to the relevant NESHAP for their source category regardless of whether the sources reclassify to area-source status. The EPA finds that the 2020 MM2A rulemaking interfered with our obligations under CAA section 112(c)(6), because that rulemaking allowed major sources to reclassify to area source status but did

not address the section 112(c)(6) requirement that such sources remain subject to standards issued under section 112(d)(2) or (d)(4). The Agency is therefore taking this action to assure that even if CAA section 112(c)(6)-affected sources reclassify, they remain subject to standards under CAA section 112(d)(2) or 112(d)(4). The EPA finds that this interpretation of CAA section 112(c)(6) comports with the text and purpose of the statute, relevant case law, and the context of CAA section 112(c)(6) within CAA section 112. The EPA is not revisiting our determination that we do not have an ongoing obligation to update the list of source categories used to reach the CAA section 112(c)(6) 90 percent requirements.

In this action the EPA is fulfilling our obligations under CAA section 112(c)(6), which provides that with respect to seven persistent and bioaccumulative HAP, the EPA shall "list categories and subcategories of sources assuring that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsection (d)(2) or (d)(4)." The EPA finds the best interpretation of CAA section 112(c)(6) is that the provision required the EPA to "list" source categories and "assure" that sources within those categories are and remain "subject to standards under subsection (d)(2) or (d)(4)." That is, we find that CAA section 112(c)(6) established two obligations for EPA: (1) to list categories and subcategories of sources to reach the 90 percent threshold; and (2) to assure such sources are subject to CAA section 112(d)(2) or 112(d)(4) requirements. The EPA satisfied the first obligation by listing and identifying categories and subcategories of sources to account for 90 percent of the aggregate emissions of each of the seven HAP listed in CAA section 112(c)(6) in prior actions, which are discussed in section II.B. of this preamble. When we issued our listing determinations, the OIAI policy in effect at that time ensured the second obligation—to assure that affected sources are subject to standards under CAA section 112(d)(2) or 112(d)(4)—would be satisfied in perpetuity, because listed sources could not avoid CAA section 112(d)(2) or (d)(4) controls by reclassifying. However, since the EPA withdrew the OIAI policy and allowed major sources to reclassify to area source status, and no longer be subject to major source NESHAP requirements and as a result possibly relaxing their emissions controls, the EPA finds that we are now obligated to promulgate this

rulemaking to assure that sources in the listed categories nonetheless remain subject to standards under CAA section 112(d)(2) or 112(d)(4).

For these reasons, the EPA finds it is necessary to require that any source subject to major source NESHAP used to reach the CAA section 112(c)(6) 90 percent thresholds on September 10, 2024 remains subject to the same NESHAP regardless of whether the source reclassifies. In other words, a facility cannot avoid these CAA section 112(c)(6)-specific NESHAP by otherwise reclassifying from major to area source status after the effective date of this final rule. This final rule does not prevent reclassification for such sources. If a source is subject to multiple NESHAP, including some that are used to reach the CAA section 112(c)(6) 90 percent thresholds and others that are not, the source must remain subject to the CAA section 112(c)(6) NESHAP but is not required to remain subject to other major source NESHAP after reclassification.

The EPA finds support for this action in the special attention Congress paid to the seven HAP in CAA section 112(c)(6), by introducing additional requirements for these specific pollutants. The EPA finds that by allowing sources emitting these seven HAP to reclassify to area source status without maintaining CAA section 112(d)(2) or (d)(4) requirements for the NESHAP used to meet the 90 percent thresholds under CAA section 112(c)(6), the 2020 MM2A rule violated Congress' mandate that the EPA "assure" these sources are subject to CAA section 112(d)(2) or 112(d)(4) requirements. This mandate reflects Congress' clear intent that the EPA not only list source categories sufficient to cover 90 percent of the seven HAP identified in section 112(c)(6), but also ensure that these source categories remain subject to standards under CAA section 112(d)(2) or 112(d)(4), as opposed to the lesser GACT-level standards that frequently apply to area sources. In light of the ability of a major source to reclassify to an area source at any time as a result of the 2020 MM2A final rule, the EPA finds that the best way to achieve Congress' direction to, "assur[e] that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsection (d)(2) or (d)(4)," is for CAA section 112(c)(6) listed source categories to maintain CAA section 112(d)(2) or (d)(4) controls and other requirements in the NESHAP. This will also ensure that any future revisions to these NESHAP (*e.g.,* promulgated under CAA sections 112(f) or 112(d)(6) to amend the applicable

NESHAP) will apply to these sources. Sources covered by CAA section 112(c)(6)-listed NESHAP that are subject to title V permitting requirements remain subject to those requirements if they reclassify to area source status. In general, area sources subject to a NESHAP are required to have a title V permit unless the EPA has exempted the source category from title V permit. See, *e.g.*, 40 70.3(b)(2). In addition, because certain NESHAP require sources to comply with title V permitting requirements, sources that remain subject to such NESHAP through this rulemaking must therefore also continue to comply with title V permitting requirements.

The EPA finds that its interpretation of CAA section 112(c)(6) also comports with the D.C. Circuit's description of the EPA's CAA section 112(c)(6) obligations in *Sierra Club* v. *EPA,* 863 F.3d 834 (D.C. Cir. 2017), and is supported by commenters to the 2023 MM2A proposal. In *Sierra Club* v. *EPA,* the court read CAA section 112(c)(6) to create two requirements for the EPA: (1) to list categories and subcategories of sources of the seven specific HAP that account for 90 percent of the aggregate emissions of each; and (2) to establish and subject the listed sources to MACT standards. 863 F.3d 834, 835 (D.C. Cir. 2017). In that case, the court explained that CAA section 112(c)(6) requires the EPA, "to establish and subject these listed sources to MACT standards, . . . even if [the EPA] would have otherwise had the discretion to apply a less-stringent standard to any area sources on the list." *Id.* Two commenters to the 2023 MM2A proposed rule agreed with this interpretation, stating that CAA section 112(c)(6) creates an independent mandate that comprises both listing sources and promulgating standards. Further, these commenters noted that allowing CAA section 112(c)(6) sources to reclassify to avoid meeting MACT standards would defeat the primary purpose of the provision, which is to ensure that both major and area sources of these specific HAP are subject to the most protective standards possible. We note that a number of area source categories have been subjected to MACT standards under CAA section 112(c)(6), including gold mines, electric arc furnace steelmaking, and area source coal fired boilers because these sources emit the specified HAP listed in CAA section 112(c)(6).

The EPA has previously established the list of source categories comprising the 90 percent thresholds in prior rulemakings and is not re-opening that determination. In this regard, the EPA is not revisiting the finding in the 2020

MM2A rulemaking (84 FR 36311) that it would not be reasonable to read CAA section 112(c)(6) to require an unattainable goal of continuing to meet the 90 percent threshold requirement even as overall emissions decline due to compliance with MACT standards. In that rulemaking, however, the EPA did not sufficiently consider the import of allowing 112(c)(6)-affected sources to reclassify—namely that in some cases, such sources could escape MACT standards and thereby undermine the protections that Congress laid out in CAA section 112(c)(6).

Prior to the 2018 MM2A memo and 2020 MM2A rulemaking, the EPA had previously satisfied our obligation under CAA section 112(c)(6) to "assure" sources in listed source categories remain subject to CAA section 112(d)(2) or (d)(4) standards, because no major NESHAP sources were able to reclassify as area sources after the first substantive compliance date of the applicable NESHAP. However, now that major sources are able to reclassify at any time as a result of the 2020 MM2A final rule, the EPA finds this action is necessary to ensure that both obligations reflected in CAA section 112(c)(6) are met. Because of the 2020 MM2A rulemaking, CAA section 112(c)(6)-listed major sources may currently reclassify to area source status without any requirement that they remain subject to CAA section 112(d)(2) or (d)(4) standards—thereby thwarting the second mandate of CAA section 112(c)(6). This rule addresses that problem.

The EPA's prior actions and statements regarding CAA section 112(c)(6) are not at odds with this action. The EPA's prior CAA section 112(c)(6) actions focused on listing source categories to satisfy the 90 percent threshold requirement. However, because the OIAI policy was in place at the time of those actions, the EPA did not consider that sources subject to the listed NESHAPs could subsequently reclassify, and that the EPA's obligation to assure that those listed source categories are subject to CAA sections 112(d)(2) and (d)(4) standards could be abrogated. In the 2015 listing rulemaking, the EPA explained, "CAA section 112(c)(6) requires the EPA to ensure that source categories responsible for at least 90 percent of the aggregate emissions of each of the 7 specified pollutants are subject to standards under CAA sections 112(d)(2) or 112(d)(4)" (80 FR 31470, 31471, June 3, 2015). Because the OIAI policy was in place at the time of that rulemaking, the EPA had no occasion to consider that a facility included in the listed source categories identified in

that rulemaking would be able to reclassify after the first substantive compliance date and subsequently evade CAA section 112(d)(2) or (d)(4) standards. The EPA noted at the time of the 2015 rulemaking that the "CAA section 112(c)(6) determination is a simple, discretionary accounting of the EPA's previous regulatory efforts." The EPA continues to agree with that conclusion in that the first aspect of the EPA's CAA section 112(c)(6) authority, and what was addressed in that rulemaking, was a listing exercise. This action is meant to maintain the status quo by ensuring that sources in those previously listed source categories that account for 90 percent of the enumerated HAP in CAA section 112(c)(6) remain subject to the standards called for in the statute.

In the 2020 MM2A rulemaking the EPA disagreed with commenters who claimed that CAA section 112(c)(6) created a continuous obligation such that affected sources could not reclassify. The EPA does not revisit that determination here, but in any event the Agency's reason for disagreement with such comments is distinct from the Agency's rationale here. This rulemaking does not upset the previously established 90 percent thresholds, nor create a "never-ending cycle of listing and regulation in order to achieve an unattainable goal of ensuring that 90 percent of emissions are regulated," which the EPA expressed concerns about in the 2020 MM2A rule (85 FR 73861) and does not reconsider here. Rather this rulemaking closes a regulatory gap to address the EPA's obligation under CAA section 112(c)(6) that was opened with the 2018 MM2A memorandum and 2020 rulemaking. Further, this rulemaking does not prevent any source from reclassifying, rather we are adding requirements to ensure that reclassification for certain sources does not undermine Congress's intent that these sources are subject to standards under CAA section 112(d)(2) or 112(d)(4).

The EPA's authority for this action is distinct from the EPA's authority to either allow or prevent sources subject to a NESHAP applicable only to major sources from reclassifying (*i.e.,* the MM2A and OIAI policies). As the EPA explained in the 2020 MM2A final rule, those policies centered on the "major source" and "area source" definitions under CAA sections 112(a)(1) and (2). By contrast, in this rulemaking, the EPA is acting to fulfill an obligation under CAA section 112(c)(6) that applies regardless of how the Agency addresses

the broader question of whether major CAA section 112 sources may reclassify.

Though not implicated in this action, we believe the broader questions regarding reclassification deserve further consideration. The EPA will consider revisiting these questions in a future action. Legal and policy questions surrounding the 2020 MM2A rule remain unsettled. The EPA finds there is general support in the text, purpose, and legislative history of CAA section 112 for the idea that certain sources should maintain MACT standards even if they reclassify. The EPA believes that allowing sources to increase their emissions after reclassification beyond the level allowed under the relevant NESHAP does not comport with the broader structure of CAA section 112. If such emissions increases were contemplated by the statute, Congress would set MACT standards at either (1) the maximum degree of emissions reduction, or (2) reductions sufficient to bring emissions below the major source threshold, whichever is less stringent. Clearly, Congress did not do so. In fact, Congress acknowledged the possibility of requiring elimination of HAP emissions through MACT standards (CAA section 112(d)(2)(A)). At present, however, the EPA is not addressing this discrepancy. Rather, we are addressing only CAA section 112(c)(6)-affected sources, while we continue to evaluate ways to address the tension between MM2A and the requirements of the rest of CAA section 112.

In the interest of timely addressing what the EPA finds is a particular concern due to the need to fulfill CAA section 112(c)(6), the EPA is finalizing this action to apply only prospectively, *i.e.,* just with respect to sources that have not yet reclassified. The EPA is not at this time requiring sources that have already reclassified to come back into compliance with the relevant NESHAP, as this would involve complicated questions about appropriate compliance schedules among other issues. However, the EPA continues to consider whether additional actions are needed for sources that have already reclassified.

*B. Other Aspects of the September 2023 Proposal*

1. What did we propose related to reclassification effective date, notifications, and CBI reporting?

In the September 2023 proposal, the EPA proposed that reclassifications that occur after the effective date of this action will be effective upon the date of electronic submittal of the notification to the EPA. Additionally, the EPA

proposed to clarify the original intent of the language in 40 CFR 63.9(j) to more clearly indicate that applications for reclassification must be submitted to the Compliance and Emissions Data Reporting Interface (CEDRI) and contain the information required in 40 CFR 63.9(j)(1) through (4). We also proposed to update the procedures for submittal of confidential business information to include electronic submittal procedures.

2. How have these aspects of the proposed rule changed since proposal?

We received significant public comments on the proposed clarifications related to reclassification effective date and submission of the required notification of reclassification on the interaction between the proposal and state permitting programs. We have determined that these comments warrant further evaluation and are not finalizing these aspects of the proposal in this action. We also received public comments on the clarifications to the notification already required under 40 CFR 63.9(j). These comments and our responses are in section IV.B.3. below. We did not receive public comments on the proposed changes to the CBI submittal procedures.

3. What comments did we receive on the proposed clarifications to notification requirements and procedural issues related to proposed amendatory text?

*Comment:* One commenter stated that the proposed requirement that reclassifications will only become effective once a permit containing the proposed enforceable requirements is issued and electronic notification is submitted to the EPA through CEDRI, per 40 CFR 63.9(j), is inconsistent with how permits and legal enforceability have historically been understood under the CAA. The commenter recommended that the EPA should not require electronic notification to be an element of determining reclassification. The commenter explained that if applicable major source NESHAP continue to apply until electronic notification is submitted, permits issued to reclassifying sources would need to include a compliance schedule for both the applicable major source NESHAP requirements and the safeguards because both would be applicable until electronic certification could be submitted.

One commenter agreed that sources should notify the Agency of reclassification and such notification is for everyone's benefit as it makes clear which regulatory standards apply to sources upon reclassification.

One commenter agreed that emission and PTE change notifications should be submitted through CEDRI to increase public access to this information. Another commenter requested additional clarification regarding the content and format of the information that would be required to be submitted through CEDRI, and 2 commenters generally supported the proposed notification requirement if it would not be too burdensome. A commenter supported the requirement that the reclassification effective date must match the electronic notification submittal date to the EPA. Otherwise, the commenter expressed concerns that sources would not provide adequate notice before reclassifying, which would be "neither administrable nor logically tenable" and could make monitoring efforts more difficult.

Two commenters maintained that the proposed notification requirement would be burdensome and unnecessary and pointed out that the EPA does not currently require this type of reporting for Prevention of Significant Deterioration, Nonattainment New Source Review, or title V opt-outs. In addition, several commenters remarked that reclassified sources are already required to submit notifications of any permit modifications under the title V program, subject to related permitting authority requirements and make reclassification information available to the public through the state permitting process. One commenter warned that the proposed requirement could supersede enforceable permit conditions and result in potential compliance concerns for sources and permitting agencies.

Several commenters disagreed with the proposed requirement that future reclassifications would not be effective until the source electronically submits the notification to the EPA. One commenter contended that the EPA does not have the authority under CAA section 112 and that the EPA did not identify the CAA provision for this proposed requirement. The commenter emphasized that according to the definitions of "major source" and "area source" in CAA sections 112(a)(1) and (2), a source's HAP PTE is the primary factor for identifying major versus area sources, and 2 commenters indicated that a source's reclassification effective date should coincide with the effective date of the change in PTE. Furthermore, one commenter asserted that since the EPA did not explain the legal basis for the proposed requirement to link reclassification effectiveness to the electronic notification submittal, the

proposed requirement would violate CAA section 307(d)(3).

A commenter objected to the proposed approach that additional requirements would apply to prior reclassifications. The commenter explained that major source status and associated obligations cease after reclassifying to area source status, so the EPA would not have the statutory authority to impose new, additional requirements for sources that already reclassified.

*Response:* In this final action, the EPA is codifying the clarifying language regarding the information that is already required in the notification that must be submitted pursuant to section 40 CFR 63.9(j) by sources that reclassify. This clarifying language does not substantively change what is already required to be submitted by sources that reclassify from major to area source status. Because this is a clarification of existing requirements there is no added burden related to the clarifications to reporting language made in this final action. Regarding the comments associated to reclassification effective date and submission of the required notification of reclassification and the interaction between the proposal and state permitting programs, we have determined that these comments warrant further evaluation and we are not responding to these comments nor finalizing these aspects of the proposal in this action.

*Comment:* One commenter states that the EPA did not publish the proposed regulatory language in the **Federal Register**. Instead, the commenter notes that the EPA placed the regulatory language in a separate document in the docket. The commenter asserts that the EPA runs the risk of creating discrepancies between the description of the proposed text in the **Federal Register** and the proposed regulatory text available in the docket. Such discrepancies prevent source owners/ operators and other stakeholders, including members of the general public who may not have sufficient familiarity with online dockets, from receiving adequate notice of the EPA's proposed action, thus impairing their ability to provide informed comments. According to the commenter, the EPA also runs the risk of running afoul of its statutory duty under the Administrative Procedure Act to provide the public with adequate notice.

*Response:* The proposal met all APA and CAA notice-and-comment requirements. Nothing in the APA or the CAA requires the EPA to publish proposed rule text in the **Federal Register**. The APA does not require

publication of proposed rule text in the **Federal Register**. Section 553(b)(3) of the APA provides that a notice of proposed rulemaking shall include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." Thus, the APA clearly provides flexibility to describe the "subjects and issues involved" as an alternative to inclusion of the "terms or substance" of the proposed rule. *See also Rybachek* v. *U.S. EPA,* 904 F.2d 1276, 1287 (9th Cir. 1990) (EPA's failure to propose in advance the actual wording of a regulation does not make the regulation invalid where EPA's discussion of the regulatory provisions "clearly describe[s] 'the subjects and issues involved.'").

Although in the past the EPA has at times published proposed amendatory regulatory text, the EPA's practice has varied. See, *e.g.,* Hazardous Air Pollutants: Proposed Regulations Governing Constructed, Reconstructed or Modified Major Sources, 59 FR 15504 (April 1, 1994) ("The proposed regulatory text is not included in the **Federal Register** notice, but is available in Docket No. A–91–64 or by request from the EPA contact persons designated earlier in this note. The proposed regulatory language is also available on the Technology Transfer Network (TTN), of EPA's electronic bulletin boards."); Federal Standards for Marine Tank Vessel Loading and Unloading Operations and National Emission Standards for Hazardous Air Pollutants for Marine Tank Vessel Loading and Unloading Operations, 59 FR 25004 (May 13, 1994) ("The proposed regulatory text and other materials related to this rulemaking are available for review in the docket."). Even when we do include the proposed text in the **Federal Register**, we often include a redline version of proposed regulations in the docket for rulemakings to assist the public in understanding the proposed regulatory changes. In our experience, stakeholders find the redline version far more useful than the proposed amendatory language in the format required by the Office of the Federal Register. Although appropriate for the task of revising the CFR, this language can be difficult to assess without the accompanying full regulatory text. Given this and given that we rarely receive comments on the proposed amendatory language or on proposed regulatory language at all, we determined that for rulemakings such as this, it would be more efficient to take the approach here of making both easily accessible but not including the

proposed amendatory text in the document.

**4. What is the rationale for our final approach for the other aspects of the September 2023 proposal?**

In light of the comments received on the proposed clarifications regarding reclassification effective date, we are not finalizing any regulatory changes related to this provision. However, we note that the notification of change in information already required under 40 CFR 63.9(j) for sources that reclassify is not an optional notification and must be submitted within 15 days after reclassification. We are finalizing the clarifications to the required components of a notification of reclassification as proposed. The regulatory language related to this issue does not add any new requirements, rather, the EPA is clarifying what these reports must already contain. We are also finalizing the regulatory language related to submission of CBI as proposed. The EPA did not receive public comments on these proposed changes and the final regulatory language which allows for and provides the procedures for submitting CBI electronically.

## V. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

*A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review*

This action is a "significant regulatory action" as defined in Executive Order 12866, as amended by Executive Order 14094. Accordingly, EPA submitted this action to the Office of Management and Budget (OMB) for Executive Order 12866 review. Documentation of any changes made in response to the Executive Order 12866 review is available in the docket.

The EPA has not prepared a quantitative analysis of the potential costs and benefits associated with this action because it is highly uncertain which facilities may reclassify in the future and as result of the final rule continue to be subject to CAA 112(c)(6) NESHAP requirements, and no emissions changes are projected to result from the CAA section 112(c)(6) requirements.[15] Instead, these

---

[15] In the Regulatory Impact Analysis for the 2020 MM2A Final Rule, the EPA assumed in the primary
Continued

requirements maintain the status quo for sources subject to the NESHAP used to meet the EPA's obligations under CAA section 112(c)(6), even if those sources reclassify. The costs incurred for a given facility due to compliance with any individual NESHAP are better attributed to those individual NESHAP rules—rather than the General Provisions of 40 CFR part 63. Any future potential costs for facilities that may choose to voluntarily reclassify will experience cost savings that will outweigh any additional cost of achieving area source status. This final rule does not require any action by facilities that reclassified prior to the effective date of this final rule. Whether any cost or cost savings is incurred by any source choosing to reclassify is highly case specific and we are not providing quantitative estimates of costs in this final rule, however, we have included technical memoranda (*e.g.*, MM2A Cost Memorandum) for the 2020 final MM2A rule and the regulatory impact analysis (RIA) from that rulemaking in the docket for this action to provide illustrative examples of the types of costs and costs savings that may occur due to reclassifications. While the EPA does not expect this action to directly impact the level of control of any particular NESHAP standards, this final rule will ensure that HAP emissions reductions of the specific pollutants addressed in CAA section 112(c)(6) are achieved, and the corresponding public health and environmental benefits from decreased HAP emissions, are maintained at sources that reclassify from major sources of HAP to area sources of HAP.

### B. Paperwork Reduction Act (PRA)

This action does not impose any new information collection burden under the PRA. The final amendments to the General Provisions relate to voluntary actions taken by a source after consideration of the net impacts of this action. Therefore, this action would not impose any new information collection burden. The General Provisions do not themselves require any reporting and recordkeeping activities, and no information collection request (ICR) was submitted in connection with their original promulgation or their subsequent amendment. Any recordkeeping and reporting requirements are imposed only through the incorporation of specific elements of the General Provisions in the individual NESHAP, which are promulgated for particular source categories that have their own ICRs. The PRA costs for sources that reclassify will be properly accounted for in the ICRs for the NESHAP they were subject to. The PRA costs for sources who must remain subject to a particular NESHAP or NESHAP are properly accounted for in the ICRs for the NESHAP they remain subject to.

### C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. In making this determination, the EPA concludes that the impact of concern for this rule is any significant adverse economic impact on small entities and that the Agency is certifying that this rule will not have a significant economic impact on a substantial number [16] of small entities because the rule has no net burden on the small entities subject to the rule. Small entities that are subject to major source NESHAP requirements would not be required to take any action under this final rule; any action a source takes to reclassify as an area source for those permitted to do so would be voluntary. We expect that sources that reclassify will do so in order to experience expected cost savings that will outweigh any additional expected cost of achieving area source status. This final rule only affects potential voluntary future decisions on the part of sources. We cannot project how many sources will reclassify in the future, or whether those facilities will be owned by small entities. This final rule will not prevent any sources from reclassifying who would otherwise be eligible to do so. This action solely requires that sources subject to certain NESHAP must remain subject to those NESHAP, even if they reclassify. This final rule imposes no additional costs or requirements for sources that have already reclassified. The final MM2A rule already required electronic notification to the EPA and we are not requiring those sources who have already submitted notifications to resubmit their notifications.

### D. Unfunded Mandates Reform Act (UMRA)

This action does not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This action imposes no enforceable duty on any state, local or tribal governments or the private sector.

### E. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

### F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action does not have tribal implications as specified in Executive Order 13175. This final rule does not require any action on the part of any sources or by tribal governments. This action solely requires that sources subject to certain NESHAP must remain subject to those NESHAP, even if they reclassify. Thus, Executive Order 13175 does not apply to this action. Consistent with the EPA Policy on Consultation and Coordination with Indian Tribes, the EPA consulted with tribal officials during the development of this action. A summary of that consultation is provided in the docket for this rule (Docket ID No.: EPA–HQ–OAR–2023–0330).

### G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

The EPA interprets Executive Order 13045 as applying only to regulatory actions considered significant under section 3(f)(1) of Executive Order 12866 and that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of Executive Order 13045. This action is not subject to Executive Order 13045 because it does not directly regulate any emission source and will not have any direct impact on children's health. The emissions reductions achieved by individual NESHAP are properly accounted for in those individual NESHAP rather than the General Provisions. This action will not change the level of emissions reductions achieved by those NESHAP. While we

---

scenario that all facilities under 75% of the major source HAP emissions threshold that could potentially reclassify would do so over a 5-year time period from promulgation (2,700 facilities). While we are still within that time frame, the EPA has not seen nearly that many reclassifications occuring since the rule was promulgated. At the time of this final rule, around 200 facilities have reclassified. This represents over 90% fewer reclassifications than our illustrative analysis included in the 2020 final rule. A list of facilities that have reclassified from major source to area source status at the time of proposal is available in the docket for this action.

[16] We note that during development of the 2020 final rule, an analysis of 69 facilities that had reclassified found that 28 of those facilities were owned by 28 small entities based on the Small Business Administration (SBA) small business size standards at the time. This analysis is included in the public docket for the 2020 final rule (Docket ID No.: EPA–HQ–OAR–2019–0282–0650).

do not expect this action to have any direct impact on children's health, continued compliance with NESHAP used for CAA section 112(c)(6) by a source that reclassifies will provide continued protection achieved by those NESHAP(s) that the source remains subject to.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution or use of energy. The final amendments in this action are procedural changes and do not impact the technology performance nor level of control of the NESHAP governed by the General Provisions.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing Our Nation's Commitment to Environmental Justice for All*

The EPA believes that this type of action does not concern human health or environmental conditions and therefore cannot be evaluated with respect to potentially disproportionate and adverse effects on communities with environmental justice concerns. We are unable to quantitatively estimate the potential environmental justice (EJ) impact of this rule because the final amendments to the General Provisions are procedural changes and do not impact the technology performance nor level of control of the NESHAP governed by the General Provisions.

While the EPA does not expect this action to directly impact the level of control of any particular NESHAP standards, this final rule will assure that emissions reductions of persistent, bioaccumulative HAP, and the corresponding public health and environmental benefits from decreased HAP emissions are maintained for all populations, including communities with EJ concerns.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United

States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

**List of Subjects in 40 CFR Part 63**

Environmental protection, Administrative practice and procedures, Air pollution control, Hazardous substances, Intergovernmental relations, Reporting and recordkeeping requirements.

**Michael S. Regan,**
*Administrator.*

For the reasons stated in the preamble, the Environmental Protection Agency amends part 63 of title 40, chapter I, of the Code of Federal Regulations as follows:

**PART 63—NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS FOR SOURCE CATEGORIES**

■ 1. The authority citation for part 63 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

**Subpart A—General Provisions**

■ 2. Amend § 63.1 by adding paragraph (c)(6)(iii).

**§ 63.1   Applicability.**

\* \* \* \* \*

(c) \* \* \*
(6) \* \* \*
(iii) After September 10, 2024, affected sources subject to the following 40 CFR part 63 subparts on September 10, 2024, must remain subject to those subparts, and any modifications thereafter, even if the source becomes an area source by reducing both its actual emissions and potential to emit hazardous air pollutants to below major source thresholds: F, G, H, I, L, R, X, CC, GG, II, JJ, KK, LL, MM, EEE, HHH, JJJ, LLL, RRR, UUU, FFFF, JJJJ, MMMM, PPPP, ZZZZ, CCCCC, DDDDD, FFFFF, IIIII, LLLLL, YYYYY, JJJJJJ, EEEEEEE.

\* \* \* \* \*

■ 3. Amend § 63.9 by:
■ a. Revising paragraph (j) and paragraph (k) introductory text; and
■ b. Adding paragraph (k)(3).
The revisions and addition read as follows:

**§ 63.9   Notification requirements.**

\* \* \* \* \*

(j) *Change in information already provided.* Any change in the information already provided under this section shall be provided to the Administrator within 15 calendar days after the change. The owner or operator of a major source that reclassifies to area source status is also subject to the

notification requirements of this paragraph. The owner or operator may submit the application for reclassification with the regulatory authority (*e.g.,* permit application) according to paragraph (k) of this section to fulfill the requirements of this paragraph, but the information required in paragraphs (j)(1) through (4) of this section must be included. A source which reclassified after January 25, 2018, and before January 19, 2021, and has not yet provided the notification of a change in information is required to provide such notification no later than February 2, 2021, according to the requirements of paragraph (k) of this section. Beginning January 19, 2021, the owner or operator of a major source that reclassifies to area source status must submit the notification according to the requirements of paragraph (k) of this section. A notification of reclassification must contain the following information:

(1) The name and address of the owner or operator;
(2) The address (*i.e.,* physical location) of the affected source;
(3) An identification of the standard being reclassified from and to (if applicable); and
(4) Date of effectiveness of the reclassification.

(k) *Electronic submission of notifications or reports.* If you are required to submit notifications or reports following the procedure specified in this paragraph (k), you must submit notifications or reports to the EPA via the EPA's Compliance and Emissions Data Reporting Interface (CEDRI), which can be accessed through the EPA's Central Data Exchange (CDX) (*https://cdx.epa.gov/*). The notification or report must be submitted by the deadline specified. The EPA will make all the information submitted through CEDRI available to the public without further notice to you. Do not use CEDRI to submit information you claim as confidential business information (CBI). Although we do not expect persons to assert a claim of CBI, if you wish to assert a CBI claim for some of the information in the report or notification, you must submit the information claimed to be CBI according to the procedures in paragraph (k)(3) of this section.

\* \* \* \* \*

(3) If you wish to assert a CBI claim for some of the information submitted under paragraph (k) of this section, you must submit a complete file, including information claimed to be CBI, to the EPA following the procedures in paragraphs (k)(3)(i) through (iv) of this section. Where a subpart specifies a

specific file format for the report or notification for which you are asserting a claim of CBI, the complete file that you submit under this paragraph (k)(3) must be in the same file format specified in the subpart.

(i) Clearly mark the part or all of the information that you claim to be CBI. Information not marked as CBI may be authorized for public release without prior notice. Information marked as CBI will not be disclosed except in accordance with procedures set forth in 40 CFR part 2. All CBI claims must be asserted at the time of submission. Anything submitted using CEDRI cannot later be claimed CBI. Furthermore, under CAA section 114(c), emissions data are not entitled to confidential treatment, and the EPA is required to make emissions data available to the public. Thus, emissions data will not be protected as CBI and will be made publicly available.

(ii) You must submit the same file submitted to the CBI office with the CBI omitted to the EPA via the EPA's CDX as described in paragraph (k) of this section.

(iii) The preferred method to receive CBI is for it to be transmitted electronically using email attachments, File Transfer Protocol, or other online file sharing services. Electronic submissions must be transmitted directly to the OAQPS CBI Office at the email address *oaqpscbi@epa.gov,* and as described above, should include clear CBI markings. Electronic Reporting Tool (ERT) files should be flagged to the attention of the Group Leader, Measurement Policy Group; all other files should be flagged to the attention of the Sector Lead for the subpart for which you are submitting your notification or report. If assistance is needed with submitting large electronic files that exceed the file size limit for email attachments, and if you do not have your own file sharing service, please email *oaqpscbi@epa.gov* to request a file transfer link.

(iv) If you cannot transmit the file electronically, you may send CBI information through the postal service to the following address: U.S. EPA, Attn: OAQPS Document Control Officer, Mail Drop: C404–02, 109 T.W. Alexander Drive, P.O. Box 12055, RTP, NC 27711. ERT files should also be flagged to the attention of the Group Leader, Measurement Policy Group; all other files should also be flagged to the attention of the Sector Lead for the subpart for which you are submitting your notification or report. The mailed CBI material should be double wrapped and clearly marked. Any CBI markings

should not show through the outer envelope.

[FR Doc. 2024–20074 Filed 9–9–24; 8:45 am]

**BILLING CODE 6560–50–P**

---

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

### 50 CFR Part 17

**[Docket No. FWS–HQ–ES–2021–0149; FXES1113090FEDR–245–FF09E21000]**

**RIN 1018–BG02**

## Endangered and Threatened Wildlife and Plants; Technical Corrections for Seven Species on the List of Endangered and Threatened Wildlife and Six Species on the List of Endangered and Threatened Plants

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule; technical amendments.

**SUMMARY:** We, the U.S. Fish and Wildlife Service, announce the correction of errors in the Lists of Endangered and Threatened Wildlife and Plants (Lists) made in previous publications. These corrections of publication errors are editorial in nature and involve no substantive changes to the Lists or any applicable regulations.

**DATES:** This rule is effective September 10, 2024.

**FOR FURTHER INFORMATION CONTACT:** Rachel London, Manager, Branch of Delisting and Foreign Species, U.S. Fish and Wildlife Service, MS: ES, 5275 Leesburg Pike, Falls Church, VA 22041–3803; telephone 703–358–2491. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:**

## Background

The List of Endangered and Threatened Wildlife and the List of Endangered and Threatened Plants (''Lists''), which are set forth in title 50 of the Code of Federal Regulations (CFR) at §§ 17.11 and 17.12, respectively, contain certain information on the endangered species and threatened species federally listed pursuant to the Endangered Species Act of 1973, as

amended (ESA; 16 U.S.C. 1531 *et seq.*). The information in the Lists includes each listed species' common name and scientific name, the geographic area where the species is listed for purposes of the ESA, its listing status (*e.g.,* endangered), and nonregulatory information providing citations to applicable **Federal Register** publications and regulations.

The regulations at 50 CFR 17.11(c) and 17.12(b) direct us to use the most recently accepted scientific name of any wildlife or plant species, respectively, that we have determined to be an endangered or threatened species.

## Purpose of Final Rule

This final rule revises the Lists at 50 CFR 17.11(h) and 17.12(h) to correct the editorial errors identified below under Summary Table of Editorial Corrections. These corrections are purely administrative and are based on previously published rulemaking documents.

We are publishing this rule without a prior proposal because we previously provided a public comment period on the proposed rules for these taxa and because this is a noncontroversial action that is in the best interest of the public and that should be undertaken in as timely a manner as possible. None of these changes are regulatory in nature; they are for accuracy and clarity. These revisions do not alter species' protections or status in any way. Any actions altering a species' protection or status would require a separate rulemaking action following the procedures of 50 CFR part 424.

## Summary Table of Editorial Corrections

The table below identifies the editorial corrections we are making in this rule. The table provides the current listing information for each species to be corrected, the type of error and a description of the correction we are making, and the correction itself.

Where the table refers to the ''2016 Reformatting'' that means an August 4, 2016, final rule (81 FR 51550) that we published to update the format of the Lists. The purpose of the 2016 Reformatting was to make the Lists easier to understand by changing the format to reflect current practices and standards, and to correct identified errors in entries such as footnotes and spelling, and to update common names, among other changes. Following the 2016 Reformatting's publication, however, we identified editorial errors in the updated Lists.

Where the table refers to the ''1983 Republication'' that means a July 27, 1983, final rule (48 FR 34182) in which